Filed 4/1/25; Opinion on remand from Supreme Court

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

PATRICK KRUG,

     Plaintiff and Appellant,

     v.

BOARD OF TRUSTEES OF THE
CALIFORNIA STATE UNIVERSITY,

     Defendant and Respondent.

B320588

(Los Angeles County
Super. Ct. No. 21STCV14538)

APPEAL from a judgment of the Superior Court of Los
Angeles County, Carolyn B. Kuhl, Judge.  Affirmed.

     Stiller Law Firm, Ari. J. Stiller; Hennig Kramer Ruiz &
Singh, Kramer Brown Hui, Jennifer Kramer, Shoshee Hui; Gunn
Coble, Beth Gunn, Catherine J. Coble for Plaintiff and Appellant.

     Call & Jensen, Julie R. Trotter, Jacqueline Beaumont,
Melinda Evans for Defendant and Respondent.

_____

When the COVID-19 pandemic struck, the Board of Trustees of the California State University (CSU) directed that instruction be provided remotely. To comply with this directive, Patrick Krug, a biology professor at California State University Los Angeles, incurred expenses for a computer and other equipment and necessities which CSU declined to reimburse. Krug sued CSU on behalf of himself and similarly situated faculty, alleging Labor Code section 2802 obligated CSU to reimburse its employees for necessary work-related expenses. CSU demurred, arguing that as a department of the state it enjoyed broad exemption from Labor Code provisions that infringe on its sovereign powers. Krug appealed from a judgment of dismissal entered after the trial court sustained CSU's demurrer without leave to amend.

We affirmed the judgment, holding that absent express words or positive indicia to the contrary, Labor Code section 2802 did not obligate CSU, a public institution, to reimburse employees for work-related expenses because CSU did not fall within the general words of the section, and subjecting CSU to the section in this case would impair its sovereignty by infringing on the broad discretion it enjoys under the Education Code to set its own equipment reimbursement policies.

Our Supreme Court granted review pending its decision in *Stone v. Alameda Health System* (2024) 16 Cal.5th 1040 (*Stone*), after which it remanded the matter to us for reconsideration in light of its holding in that case.

After reconsideration in light of *Stone*, we again affirm the judgment.

# BACKGROUND

The CSU system is a "state agency . . . in the field of public higher education which is charged with the management, administration, and control of the State College System of California." (Cal. Const., art. XX, § 23; see Ed. Code, §§ 66600 [creating CSU's board of trustees]; 89000 et seq. [governing CSU].) The Legislature has conferred on CSU a variety of powers, including the power to "prescribe policies and procedures for the acquisition of services, facilities, materials, goods, supplies, or equipment." (Ed. Code, § 89036, subd. (a)(2).)

In March 2020, CSU directed its teachers to begin teaching classes remotely. Krug did so but was denied access to his workplace office to retrieve his CSU-provided computer and printer. He absorbed the cost for replacing these items himself, then asked for reimbursement, which the school denied. CSU took the position that Labor Code section 2802, subdivision (a),[1] which obligates an employer to "indemnify [an] employee for all necessary expenditures . . . incurred . . . in direct consequence of the discharge of his or her duties," did not apply to the school because such application would infringe on its sovereign powers as a department of the state.

Krug filed this class action complaint against CSU, alleging a single claim for reimbursement of home-office expenses for himself and other CSU faculty employees under section 2802.[2]

---

[1] Undesignated statutory references are to the Labor Code.

[2] Before filing the lawsuit, Krug obtained a letter from the Department of Industrial Relations (aka Division of Labor Standards Enforcement; DLSE) stating that the DLSE "disagree[d] . . . that California Labor Code Section 2802 does not apply to employees of the California State Universities."

3

Krug alleged he incurred necessary business expenses for electricity, postage, internet service charges, use of personal phones for work-related purposes, office supplies, chairs, computers, printers, ink and toner, and computer monitors required to perform his work.

He later amended the complaint to add a claim under the Private Attorneys General Act (PAGA) stemming from the same reimbursement denial but now concedes that claim is not viable.

CSU demurred to the Labor Code claim on the ground that as a department of the state it was not subject to suit for the Labor Code violation asserted, and to the PAGA claim on the ground that an employee may seek PAGA penalties against a public entity only if the underlying statute provides for civil penalties, which section 2802 did not. The trial court sustained CSU's demurrer without leave to amend, reasoning that as a governmental agency, CSU was exempt from section 2802 because that section did not expressly apply to public employers. Further, because there was no Labor Code violation, the trial court found the PAGA claim could not stand.

Krug appeals from the resulting judgment of dismissal.

## DISCUSSION

Krug contends that the language, context, and history of section 2802 demonstrate a legislative intent to require public employers to reimburse employees for reasonable work-related expenses.

4

## A.      Analytical Framework

Because this appeal is taken from a dismissal on demurrer, and involves questions of statutory interpretation, our review is de novo.  (*Stone, supra,* 16 Cal.5th at p. 1052.)

Our fundamental task in interpreting a statute " 'is to ascertain the Legislature's intent and effectuate the law's purpose, giving the statutory language its plain and commonsense meaning.  [Citation.]  We examine that language in the context of the entire statutory framework to discern its scope and purpose and to harmonize the various parts of the enactment.'  [Citation.]  If the language is clear, ' "its plain meaning controls.  If, however, the language supports more than one reasonable construction, then we may look to extrinsic aids, including the ostensible objects to be achieved and the legislative history." ' "  (*Stone, supra,* 16 Cal.5th at p. 1052; see also *Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1190 (*Wells*) ["The statutory language itself is the most reliable indicator, so we start with the statute's words, assigning them their usual and ordinary meanings, and construing them in context.  If the words themselves are not ambiguous, we presume the Legislature meant what it said, and the statute's plain meaning governs.  On the other hand, if the language allows more than one reasonable construction, we may look to such aids as the legislative history of the measure and maxims of statutory construction"].)

" ' "[I]n light of the remedial nature of the legislative enactments authorizing the regulation of wages, hours and working conditions for the protection and benefit of employees, the statutory provisions are to be liberally construed with an eye

5

to promoting such protection." ' " (*McLean v. State of California* (2016) 1 Cal.5th 615, 622 (*McLean*).)

*Stone* involved wage-and-hour claims by healthcare workers against a public hospital. (*Stone*, *supra*, 16 Cal.5th at p. 1050.) "The operative complaint alleged that [the hospital] frequently denied or discouraged the taking of meal and rest breaks and 'automatically deducted 1/2 hour from each workday' even when meal periods were not taken." (*Ibid*.) The employees' claims fell under Industrial Welfare Commission (IWC) Wage Order No. 5-2001 (Cal. Code Regs., tit. 8, § 11050; hereafter Wage Order No. 5), which regulates working conditions of hospital employees. (*Stone*, at pp. 1050-1051.) The issue was whether the public hospital was an "employer" for purposes of the meal and rest break requirements set forth in the Labor Code and Wage Order No. 5.

The *Stone* Court examined the language, structure, and history of the statutes and wage order at issue to determine whether the Legislature intended to impose their requirements on public employers. Using this framework, the Court addressed the text and history of relevant Labor Code and wage order provisions to conclude that the hospital was exempt from the employees' claims. First, it noted that the Labor Code's meal and rest period requirements, sections 226.7 and 512, are subject to the regulations of Wage Order No. 5, which restricts application of sections 226.7 and 512 to "person[s] as defined in Section 18 of the Labor Code." (*Stone*, *supra*, 16 Cal.5th at p. 1055.) Turning to section 18, the Court found that this provision describes a "person" with words " 'most commonly associated with private individuals and entities' as opposed to public or governmental agencies." (*Stone*, at p. 1055.) Thus, section 18 was not silent

6

about whether government employers are covered; "its language affirmatively indicates that they are not." (*Stone*, at p. 1056.)

Wage Order No. 5 also states that "unless specifically noted otherwise, 'the provisions of this order shall not apply to any employees directly employed by the State or any political subdivision thereof, including any city, county, or special district.' " (*Stone*, *supra*, 16 Cal.5th at p. 1057.) "The plain language of the governing wage order thus *expressly excludes* public employers from most of the wage and hour obligations it places on private employers, including meal and rest break obligations." (*Ibid.*)

Having concluded that the relevant text expressly excludes government employers from meal and rest break requirements, the Court then confirmed that Wage Order No. 5's history is in accord:  Historically, government entities were exempt from all Wage Order provisions, and when the Wage Orders were amended in 2001 to specifically apply certain provisions to government employees, government exemption from the meal and rest period provisions in Wage Order No. 5 remained unaltered. (*Stone*, *supra*, 16 Cal.5th at pp. 1057-1058.)

The *Stone* Court rejected the employees' argument that the "sovereign powers principle," by which government entities are presumed not to be included in generally worded statutes only if their inclusion would result in an infringement upon sovereign governmental powers, did not apply because the hospital lacked sovereignty. (*Stone*, *supra*, 16 Cal.5th at pp. 1067-1068.)  "This analysis puts the cart before the horse," the Court stated, because the sovereign powers principle only comes into play when a statute's text and history are unclear. (*Id*. at p. 1067.)  The Wage Order's exemption of public entities from meal and rest period

7

requirements was thus dispositive without addressing whether the application of those requirements would infringe any sovereign powers possessed by the hospital. (*Ibid.*)

**B.     Public Entity Liability for Expense Reimbursement**

We follow *Stone*'s analytical framework to determine whether the Legislature intended to exclude public entity employers from the employment expense reimbursement obligations at issue here. We thus "examine 'the language, structure, and history of the particular statute[s] before us' to determine whether the Legislature intended to impose their requirements on public employers." (*Stone*, *supra*, 16 Cal.5th at p. 1054.) If these provide no positive indicia of a legislative intent, we resort to interpretive maxims to determine whether application of the section would invade CSU's sovereign powers. (*Ibid.* ["Although interpretive maxims may aid in that analysis, the fundamental question is always one of legislative intent"].)

1.  Statutory Language

Subdivision (a) of section 2802 provides in pertinent part: "An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer . . . ."

"The Labor Code provides no generally applicable definition of the term" "employer." (*McLean*, *supra*, 1 Cal.5th at p. 627; see *Stone*, *supra*, 16 Cal.5th at p. 1054 ["The Labor Code does not define the term 'employer' "].)

Krug argues that because the reference to "employer" in section 2802 is unqualified, the statute by its plain language encompasses "all employers." The statute "cannot be read to

8

exclude public employers," he argues, because there is no express exemption for public employers and "no indication that the Legislature intended such a specialized meaning."

A statutory provision is ambiguous if it is susceptible of two reasonable interpretations. (See *People v. Raybon* (2021) 11 Cal.5th 1056, 1065.) The unqualified term "employer" in the Labor Code may reasonably apply only to private employers even absent an express exemption for public employers. (See *Johnson v. Arvin-Edison Water Storage Dist.* (2009) 174 Cal.App.4th 729, 737 ["in the context of wage and hour provisions, the Legislature expressly refers to public entities when it intends them to be included"]; *Stone*, *supra*, 16 Cal.5th at p. 1055 ["the Legislature is capable of bringing government entities within the scope of specific legislation when it intends to do so"].)

Here, both parties have presented reasonable interpretations of section 2802: On the one hand, as CSU would have it, if the Legislature had wanted section 2802 to apply to both public and private entities, it could have said so; and on the other hand, as Krug would have it, if the Legislature intended the statute to apply only to private entities, it could have said so.[3]

---

[3] Krug relies on a 2001 DLSE opinion letter for the proposition that the DLSE has applied "general Labor Code provisions" and "a general minimum wage provision" to CSU "because the school is not subject to any statutory exception." The DLSE opinion concerned a minimum wage provision originating not from the Labor Code but from Wage Order No. MW-2001. (Cal. Code Regs., tit. 8, § 11000.) Labor Code section 1197 provides that the minimum wage is to be fixed by the IWC, "and the payment of a lower wage than the minimum so fixed is unlawful." Pursuant to this authorization, the IWC issued Wage Order No. MW-98, which exempted employees of state and local governments. In 2001, the IWC issued Wage Order No. MW-

However, our analysis cannot end where Krug suggests it should end. As *Stone* instructs, Krug's end point is only the beginning. Following our high court's guidance in *Stone*, we thus examine the statutory language not in isolation but "in the context of the entire statutory framework to discern its scope and purpose." (*Stone*, *supra*, 16 Cal.5th at p. 1052.)

### 2. Statutory Framework

In construing statutory language we look not only to the statute's plain meaning but also to the statutory framework, and we must interpret the words of the statutes 'in the sense in which they would have been understood at the time of the enactment." (*People v. Cruz* (1996) 13 Cal.4th 764, 775.)

---

2001, which raised the minimum wage and made its provisions applicable to " 'employees directly employed by the State or any political subdivision thereof, including any city, county, or special district.' " (*Marquez v. City of Long Beach* (2019) 32 Cal.App.5th 552, 561 (*Marquez*).) On April 25, 2001, in response to a question about applicability of the minimum wage to CSU, the DLSE stated that because no statute "exempted employees from the state minimum wage," it is "the Labor Commissioner's policy to enforce the state minimum wage . . . on behalf of [public] employees." (Dept. Industrial Relations, DLSE Opn. Letter No. 2001.04.25 (Apr. 25, 2001) p. 3.)

We do not take the 2001 DLSE opinion specifically addressing the application of the minimum wage provision to CSU to equate to a broad interpretation that Labor Code provisions apply to public entities unless those entities are specifically exempted. If that is the DLSE's opinion, we respectfully disagree. (See *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1029, fn. 11 (*Brinker*) [DLSE opinion letters entitled to respect but not to deference].)

10

a.  Article 2:  Sections 2806, 2807, 2808, 2808.2, 2809

The Labor Code's employment expense reimbursement obligation is found in division 3, chapter 2, article 2 of that code, titled "Obligation of Employers" (Article 2).

The statutory silence of section 2802 stands in marked contrast to neighboring provisions in Article 2 that expressly impose obligations on both private and public employers.  For example, in 1979, the Legislature added section 2806, which provides that no employer, "whether private or public," shall discontinue medical insurance coverage without notice.  (§ 2806, subd. (a), added Stats. 1979, ch 222, § 1.)  In 1992, the Legislature added section 2807, which provides that all employers, "whether private or public," must notify former employees about the availability of continued medical insurance coverage.  (§ 2807, subd. (a), added Stats. 1992, ch 722, § 9 (SB 485).)  In 1993, the Legislature added section 2808, which obligates all employers, "whether public or private," to notify employees about certain health insurance benefits.  (§ 2808, added Stats. 1993, ch. 1210, § 12.)  In 1995, the Legislature added subdivision (b) to section 2808.2, which obligates an employer that provides group medical insurance to its employees to notify its employees of the availability of conversion coverage.  Subdivision (b) states that any employer, "whether private or public," must notify its former employees about benefits available under the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA).  (§ 2800.2, subd. (b), amended Stats. 1995, ch. 489, § 6 (SB 761).)  In 1996, the Legislature added section 2809, which obligates any employer, "whether private or public," that offers employees a deferred compensation plan to notify

11

employees about the financial risks accompanying participation in the plan. (§ 2809, subd. (a), added Stats. 1996, ch. 1160, § 1.)

The specific reference to public employers in several nearby statutes in Article 2, but not in section 2802, weighs heavily against a conclusion that the Legislature intended to expose public employers to employer reimbursement liability. (See *Wells*, *supra*, 39 Cal.4th at p. 1190 ["specific enumeration of state and local governmental entities in one context, but not in the other, weighs heavily against a conclusion that the Legislature intended to" expose public school districts to California False Claims Act liability].) This legislative silence is especially voluble given that the Legislature added or amended the companion provisions long after section 2802 was enacted, yet left section 2802 alone. That the Legislature added or amended several provisions in Article 2 expressly to apply to public employers while leaving section 2802 silent on that front strongly suggests it intended not to apply the reimbursement set forth in section 2802 to public employers.

In another example from Article 2, Labor Code section 2802.1 provides that some expenses reimbursable under section 2802 must be reimbursed by public as well as private hospitals. Labor Code section 2802.1 first prescribes that the cost of any employer-required training for nursing employees and applicants is subject to the reimbursement requirement of section 2802, then states that "[t]his section," i.e., section 2802.1, and by extension section 2802 in this limited context, applies only to employees of general acute care hospitals as defined in subdivision (a) of Health and Safety Code section 1250. (Lab. Code, § 2802.1, subd. (c), added Stats. 2020, ch. 351, § 2 (AB 2588).) Subdivision (a) of Health and Safety Code section 1250,

12

in turn, specifically references two particular state-run hospitals. That the Legislature specified that certain public hospital employers are subject to the reimbursement requirements of Labor Code section 2802 in limited contexts strongly suggests the hospitals are not subject to section 2802 in general.

Krug argues that subdivision (e) of section 2801.2, which states the section "is declaratory of and clarifies existing law with respect to employer-required training for employees," reflects the Legislature's understanding that section 2802 covers public workers. This overstates the reach of subdivision (e). At most, the subdivision reflects the Legislature's understanding that section 2802 applies to employer-required training in the context of general acute care hospitals. The subdivision cannot shed light on public entity obligations as to other categories of reimbursement. As with the other provisions in Article 2 discussed above, the Legislature could have amended section 2802 at the same time it enacted section 2802.1 but did not, which further suggests it intended not to prescribe reimbursement obligations for public employers broader than those set forth in section 2802.1.

b. Other Employer Obligations

Other Labor Code provisions governing employer obligations also expressly state whether they apply to public employers. For example, section 555 declares that section 552 (which provides, "No employer of labor shall cause his employees to work more than six days in seven") is "applicable to cities which are cities and counties and to the officers and employees thereof." (§ 555.) Similarly, the statute mandating paid sick leave defines "employer" for its purposes as "any person employing another under any appointment or contract of hire and

13

includes the state, political subdivisions of the state, and municipalities." (§ 233, subd. (b)(1); see § 245.5, subd. (b)(1).) Likewise, the minimum wage law states, "For purposes of this subdivision, 'employer' includes the state, political subdivisions of the state, and municipalities." (§ 1182.12, subd. (b)(3).) This suggests that when the Legislature intended an obligation to apply to a public employer, it did so expressly.

       c. 1937 Legislative Session

In an example outside the context of employer obligations, the workers' compensation law, which was enacted in 1937 as part of the same legislation as section 2802, specifies that the term "employer" includes "[t]he State and every State agency" and "[e]ach county, city, district, and all public and quasi public corporations and public agencies therein." (§ 3300, subds. (a)-(b); Stats. 1937, ch. 90, § 3300, p. 266; *id*., § 2802, p. 258.) That the same legislative session which applied the workers' compensation scheme to public employers declined to do so in section 2802 strongly suggests the Legislature intended the latter provision to apply only to private entities.

Krug observes that the 1937 legislative session also produced section 18, which provides, " 'Person' means any person, association, organization, partnership, business trust, limited liability company, or corporation." Characterizing this as a narrow definition, Krug argues the Legislature in 1937 "knew how to impose narrower definitions when it intended," which implies its failure to do so with respect to "employer" in section 2802 evinces an intent to apply that section broadly, i.e., to public as well as private entities. We disagree. To determine whether "employer" applies to public as well as private entities in section 2802, we draw inferences only from legislative action that

14

distinguishes between those two concepts, not action which defines other terms. How the Legislature chose to define "person" in section 18 says nothing about its failure to specify whether "employer" in section 2802 includes public entities.

*Stone* relied heavily on the definition of "person" in section 18 to determine whether a wage order wage-and-hour provision in Wage Order No. 5 applied to public employers. (See *Brinker*, *supra*, 53 Cal.4th at p. 1026 ["[W]age and hour claims are . . . governed by two complementary and occasionally overlapping sources of authority: the provisions of the Labor Code, enacted by the Legislature, and a series of 18 wage orders, adopted by the IWC"].) But that was not because the Legislature intended the term "person" in section 18 to define the term "employer" elsewhere in the Labor Code. As our Supreme Court has observed, "[t]he Labor Code provides no generally applicable definition of the term." (*McLean*, *supra*, 1 Cal.5th at p. 627; see *Stone*, *supra*, 16 Cal.5th at p. 1054.) After concluding there was no applicable Labor Code definition of "employer," the *Stone* Court turned to Wage Order No. 5 for its definition because the statutes at issue in *Stone* are specifically governed by wage orders. Wage Order No. 5 stated: " ' "Employer" means any person as defined in Section 18 of the Labor Code, who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person.' (Wage Order No. 5, subd. 2(H).)" (*Stone*, at pp. 1054-1055.) Thus, the Court held section 18 helped define "employer" only because the IWC prescribed that it do so for purposes of Wage Order No. 5, not because the Legislature prescribed that it do so for the Labor Code generally. (See *Gerard v. Orange Coast Memorial Medical Center* (2018) 6

15

Cal.5th 443, 448 [" 'To the extent a wage order and a statute overlap, we will seek to harmonize them, as we would with any two statutes.' [Citation.]  But because the Legislature is the source of the IWC's authority, a provision of the Labor Code will prevail over a wage order if there is a conflict"].)  Because no wage order applies here, we have no cause to rely on the term "person" as defined in section 18 to define "employer" in section 2802.

### d.  Contrary Inference

It is true that other Labor Code provisions, relating to payment of wages, specifically *exclude* some government employers from their terms.  For example, subdivision (a) of section 220 provides that "[s]ections 201.3 [pertaining to temporary service employees], 201.5 [employees fired from production of motion pictures], 201.6 [print shoot employees], 201.7 [oil drilling employees], 201.8 [events employees], 203.1 [payment by check which is refused], 203.5 [penalty under bond], 204 [wages payable semimonthly], 204a [unified payment from simultaneous employers], 204b [weekly payment], 204c [certain executive, administrative or professional employees], 204.1 [car dealer employee], 205 [farm workers and domestic help boarded and lodged by employer], and 205.5 [agricultural employee] do not apply to the payment of wages of employees directly employed by the State of California."

Similarly, subdivision (b) of section 220 provides that "[s]ections 200 to 211, inclusive, and Sections 215 to 219, inclusive [pertaining to specific industries and to remedies, penalties and criminal liability], do not apply to the payment of wages of employees directly employed by any county, incorporated city, or town or other municipal corporation."

16

This practice somewhat "blunts any inference one might draw from legislative silence." (*Stone*, *supra*, 16 Cal.5th at p. 1056.) The blunting effect on any inference from legislative silence regarding public employers across the board *for all purposes* is minimal, however, because section 220 extends its express exemption only to certain public employers in specific limited situations.

Two competing implications thus exist. On the one hand, specific inclusion of public employers in several other provisions implies that "employer" in section 2802 refers only to private entities. On the other hand, section 220's specific exclusion of the State of California in subdivision (a) and other public entities in subdivision (b) in several wage payment situations implies that "employer" in section 2802 includes public entities. However, in our view, the competing implications do not carry the same weight. The first is supported by (1) a concerted legislative effort to expressly refer in Article 2 to public employers when a provision applies to them, an effort which left section 2802 unchanged, and (2) a companion legislative scheme (the workers' compensation law) from the same 1937 session which expressly includes public employers. The second is supported only by the express exemption of only certain public employers in limited situations.

We conclude the statutory structure evinces positive indicia that the Legislature intended to exclude government employers from the terms of section 2802.

3. Legislative History

The history of section 2802 also supports the conclusion that the Legislature intended to exclude government employers from its terms.

17

a. 1872 Civil Code Section 1969

Labor Code section 2802 derives from and is substantively identical to 1872 Civil Code section 1969.

In 1870, the California Code Commission (Commission) was appointed to draft a complete system of laws for presentation to the Legislature.  (Haymond & Burch, Civil Code of California (Annotated) (1874) (Haymond & Burch), California Code Commission Preface.)[4]  1872 Civil Code section 1969, enacted as part of this effort, was compiled by the Commission from statutes and cases from other jurisdictions and from a treatise on agency by United States Supreme Court Justice Joseph Story.  (Stats. 1937, ch. 90 [Labor Code created to "consolidate[] and revise[] the law relating to labor and employment relations"]; see Kleps, *The Revision and Codification of California Statutes* 1849-1953 (1954) 42 Cal. L.Rev. 766.)

The Commission's commentary on 1872 Civil Code section 1969 confirms the statute was influenced by numerous common law and statutory authorities, including from New York, Louisiana and England, going back to the early 19th century. The Commission parsed its commentary according to the following concepts in the statute:  "indemnity for losses in discharge of [the employee's] duties"; "[indemnity for losses] resulting from obedience to [the] employer"; and "[indemnity] even though [the employee's actions were] unlawful."  (Code commrs., notes foll. Ann. Civ. Code, § 1969 (1st ed. 1872, Haymond & Burch, commrs. annotators) p. 598.)

---

[4] HathiTrust <https://babel.hathitrust.org/cgi/pt?id=mdp.35112104866969&seq=11&format=plaintext> [as of March 28, 2025], archived at <https://perma.cc/3SMU-EWSA>.

In determining the intent and understanding of the 1872 Legislature, we give substantial weight to the comments of the California Code Commission (Commission), which proposed the 1872 Civil Code.  (*Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804, 817.)

As pertinent here, in support of the concept of "indemnity for losses in discharge of [the employee's] duties" the Commission cited:  Story's treatise on agency; a Louisiana Civil Code section; three cases from New York; and three from England and Wales. The comment stated:  "NOTE.—"Indemnity for losses in discharge of his duties."—"Story Agency, Secs. 335-340; Code La., §§ 2991, 2993; Castle vs. Noyes, 14 N. Y., p. 332; Powell vs. Newburgh, 19 Johns., p. 284; Ramsay vs. Gardner, 11 id., p. 439; Adamson vs. Jarvis, 4 Bing., p. 66; Betts vs. Gibbins, 2 Ad. & L., p. 57; Taylor vs. Stray, 2 C. B. (N. S.), p. 196." (1872 Civ. Code, § 1969, Code Comm'n annot., p. 598.)

In modern usage, the citation is:  "Story's 'Commentaries on the Law of Agency, as a Branch of Commercial and Maritime Jurisprudence, with Occasional Illustrations From the Civil and Foreign Law' (3rd ed., 1846) sections 335-340, pp. 421-438 (*Agency*); La. Civ. Code arts. 2991 ('The principal ought to reimburse the expenses and charges, which the agent incurred in the execution of the mandate'), 2993 ('The attorney must also be compensated for such losses as he has sustained on occasion of the management of his principal's affairs') (1824); *Castle v. Noyes* (1856) 14 N.Y. 329, 332 ('it has been repeatedly held within the law of agency that a promise to indemnify is binding when the agent acts within the legitimate scope of his agency and in good faith'); *Powell v. Trustees of Village of Newburgh* (N.Y. Sup. Ct. 1822) 19 Johns. 284 (*Powell*) (agents entitled to recover costs incurred in mounting a legal defense for the principal); *Ramsay v. Gardner* (N.Y. Sup. Ct. 1814) 11 Johns. 439 (agent acting in good

19

faith for the principal's benefit is entitled to recover expenses paid on the principal's behalf); *Adamson v. Jarvis* (4 Bing. 66) (an agent who acts in good faith based on the representations of the principal is entitled to indemnity from the principal for any losses incurred as a result of those representations, provided that the agent was not aware of any wrongdoing); *Betts vs. Gibbons* (1834) 2 Ad. & E. 57 [111 Eng. Rep. R. 22] (between wrongdoers there is neither indemnity nor contribution except when the act is not clearly illegal in itself); and *Taylor v. Stray* (1857) 2 C. B. (N. S.) 196 [140 Eng. Rep. 380] (principal obligated to indemnify stock broker for purchase made on the principal's behalf)." (1872 Civ. Code, § 1969, Code Comm'n annot., p. 612.)[5]

The Commission cited nothing suggesting a definition for the concept of "employer."

Of particular interest here is the Commission's citation to *Powell*, where trustees of a municipality sought to recover expenses incurred in defending a civil lawsuit on the municipality's behalf. (*Powell*, *supra*, 19 Johns. at p. 284.) The court held these public workers were entitled to recover costs incurred in mounting the municipality's defense. (*Id*. at p. 289.) Krug argues this establishes that the Legislature intended the term "employer" in 1872 Civil Code section 1969 to refer to public as well as private entities. We disagree.

The Commission cited *Powell* as support only for the concept of "indemnity for losses in discharge of [the employee's]

---

[5] The 1824 Louisiana Civil code is available at Internet Archive <https://archive.org/details/civilcodestatel00louigoog/page/612/mode/2up> [as of March 28, 2025], archived at <https://perma.cc/G7M4-QMX3>.

duties," not for a definition of "employer," which *Powell* did not provide. Although it is true the parties seeking reimbursement for employment-related expenses in that case happened to be public employees, the court did not analyze the public nature of their employer. The case cannot stand for a principle never addressed. (See *Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 680 [an opinion is not authority for a proposition not considered].)

Krug similarly argues that the Commission's citation to Story's treatise, Agency, indicates the Legislature intended 1872 Civil Code section 1969 to prescribe a right of reimbursement for all employees without limitation, including public employers. This is so, Krug argues, because Story wrote (as quoted by Krug) that an agent's right to reimbursement is " 'implied from the very character of every agency.' " (Story, Agency, (3d ed. 1846) § 335, p. 431.) By "every agency," Krug argues, Story intended the right of reimbursement to be both private and public.

We disagree, for several reasons. First, as with *Powell*, the Commission cited Agency not for a definition of "employer" but to illuminate the concept of "indemnity for losses in discharge of [the employee's] duties." Each of the sources cited on that topic dealt with that theme, and none defined "employer."

Second, Story defined "employer" elsewhere in Agency as follows: "In the common language of life, he, who, . . . to do any act for his *own benefit*, or on his *own account*, employs another person to do it, is called the Principal, Constituent, or Employer." (Agency, *supra*, § 3, p. 3, italics added.) The Commission could have cited this definition had it intended to explain the scope of the term, but the definition would not assist Krug because it impliedly excludes public employers, as the phrases "own benefit" and "own account" communicate a private or individual interest

21

rather than a community or broader interest generally associated with the word "public."

Third, Story states that unless otherwise indicated, the type of agency under discussion "is that[] which arises in the course of commercial affairs." (Agency, *supra*, § 4, p. 5 ["The Agency, which will be principally, though not exclusively, treated of in the present work, is that[] which arises in the course of commercial affairs; and illustrations will be borrowed from other sources, only when they more fully explain the doctrines applicable to the former"].) Nothing in sections 335 to 340 in Agency, the only sections cited by the Commission to support 1872 Civil Code section 1969, indicate they apply to public (in addition to commercial) employers; the words "public" and "government" are not mentioned. Story discusses agency in public affairs in a different chapter, sections 302 to 322, which the Commission did not cite. (*Id.* at pp. 306-333.)

Fourth, whereas in his briefing Krug quotes only a fragment of one sentence in section 335 in Agency (which itself constitutes only one of six sections the Commission cited to support 1872 Civil Code section 1969), the full passage, acknowledged by Krug at oral argument, establishes that Story understood an agent's right to reimbursement exists only when the scope of the agency permits expenditures. An agent's right to reimbursement, he wrote, is "implied from the very character of every agency, *to which such advances, expenses, and disbursements are incident, whenever they fall within the appropriate duty of the agent.*" (Story, Agency, (3d ed. 1846) § 335, p. 431, italics added.) Nothing in the record suggests that Story or the Commission understood that advances, expenses and

22

disbursements are incident to and within the appropriate duties of public employees generally.

Finally, even if Story's conception of principals generally included public entities, he wrote in *U.S. v. Hoar* that in the context of legislative drafting, the general words of a statute should not include the government "unless that construction be clear and indisputable upon the text of the act." (*U.S. v. Hoar* (C.C.D. Mass. 1821) 26 F.Cas. 329, 330 ["It appears to me, therefore, to be a safe rule founded in the principles of the common law, that the general words of a statute ought not to include the government, or affect its rights, unless that construction be clear and indisputable upon the text of the act"].) Our Supreme Court quoted *U.S. v. Hoar* for this rule in *Mayrhofer v. Board of Education* (1891) 89 Cal. 110, 112, which the Court cited in *Stone* to support its holding that it "is deeply embedded in our state's jurisprudence" that "absent express words to the contrary, governmental agencies are not included within the general words of a statute." (*Stone*, *supra*, 16 Cal.5th at p. 1053.)

In sum, the only positive indication about the meaning of "employer" which can be inferred from the Commission's comments on 1872 Civil Code section 1969 is that the term referred only to private entities. The Commission cited Story's treatise on agency, in which he defined "employer" in terms of private entities and limited his discussion—in the portion of Agency cited by the Commission—to private agencies. We conclude the legislative history of Civil Code section 1969 evinces positive indicia the provision was intended to apply only to private employers.

23

b. Senate Bill No. 1305

Later legislative history is also in accord. Section 2802 was amended in 2000 by Senate Bill No. 1305 (SB 1305). Krug argues that a September 6, 2000 enrolled bill report from the California Department of Finance to Governor Davis pertaining to the fiscal impact of SB 1305 indicates the Legislature intended section 2802 to require public employers to reimburse employees for employment-related expenses. We disagree.

Before SB 1305, case law interpreting section 2802 was split on the issue of whether an employee may recover costs and attorney's fees in a civil action for indemnification under that section. (Compare *O'Hara v. Teamsters Union Local No. 856* (9th Cir. 1998) 151 F.3d 1152, 1160-1161 [costs and fees recoverable] and *Jacobus v. Krambo Corp.* (2000) 78 Cal.App.4th 1096, 1105-1106 [fees not recoverable].) The author of SB 1305 stated that section 2802 was "useless" if the cost of hiring a lawyer to enforce employee rights is greater than the unreimbursed expenses the employee is trying to recover. (Sen. Floor Analysis, Sen. Bill No. 1305, as amended Aug. 18, 2000, p. 3; see *O'Hara*, at p. 1161 ["An employer who wished to avoid paying an employee who had proven a right to indemnification under § 2802 could simply refuse—secure in the knowledge that it might very well cost the employee more to enforce his rights under § 2802 than the amount expended in the original action"].)

SB 1305 amended section 2802 to provide that interest and costs, including attorney's fees, shall be awarded to an employee in an indemnification action against an employer for necessary work-related expenditures and losses.

The Senate's Rules Committee and the Assembly's Labor and Employment Committee prepared three floor analyses

24

summarizing SB 1305, explaining the need for it, and describing its potential fiscal impact on the state.  None of the analyses found any fiscal impact on the state or suggested that section 2802 applies to public employers; the Rules Committee's report stated that the Senate's Appropriations, Budget and Fiscal Review, and Local Government committees found the bill would have no fiscal impact.  (Assem. Floor Analysis, Sen. Bill No. 1305, as amended Aug. 7, 2000 ["Fiscal Effect:  Unknown"]; Assem. Floor Analysis, Sen. Bill No. 1305, as amended Aug. 18, 2000 ["Fiscal Effect:  Unknown"]; Sen. Floor Analysis, Sen. Bill No. 1305, as amended Aug. 18, 2000 ["Fiscal Effect:  Appropriation [Com]:  No[,] [Budget and Fiscal Review] Com.:  No[,] Local [Government Com]:  No"].)

After the Legislature passed and enrolled SB 1305 and sent it to the governor, the Department of Finance drafted an "enrolled bill report" in which it stated, "We believe that by directly requiring an employer, *including state agencies*, to indemnify employees for 'all necessary expenditures and losses' incurred by an employee following directions of the employer, the bill could result in some increased operational costs for the State."  (Dept. of Finance, Enrolled Bill Rep. on Sen. Bill No. 1305 prepared for Governor Davis (Sept. 2000) p. 1, italics added; see Enrolled Bill Memorandum on Sen. Bill No. 1305 prepared for Governor Davis (Sept. 2000) p. 1.)  The Finance Department gave no explanation for its belief that section 2802 applied to state agencies.

Although an enrolled bill report prepared by a responsible agency contemporaneous with passage and before signing can be instructive on matters of legislative intent (*Elsner v. Uveges* (2004) 34 Cal.4th 915, 934, fn. 19), the Finance Department's

25

enrolled bill report on SB 1305 is not instructive.  Prepared by the Executive Branch to brief the governor after SB 1305 was enrolled but before it was signed (see *In re Lucas* (2012) 53 Cal.4th 839, 855, fn. 13), the report gave no explanation for and provided no analysis supporting its conclusion that section 2802 applied to state agencies.  For example, the report referenced nothing in the text, context or history of section 2802 suggesting it applies to state agencies, cited no caselaw, litigation, or report concerning a section 2802 reimbursement claim against a state agency, and ignored the Legislature's floor reports, which either described the fiscal impact of SB 1305 as "unknown" or stated that three Senate committees had concluded there would be no fiscal impact.  We cannot conclude that three unexplained words ("including state agencies") from the Executive Branch's Finance Committee, written after all Legislative Branch activity had concluded, indicates the *Legislature* intended that section 2802 apply to public entities.  (See *Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1218-1219, fn. 3 [although enrolled bill reports can be " 'instructive' in filling out the picture of the Legislature's purpose," they "certainly do not take precedence over more direct windows into legislative intent such as committee analyses"]; *Joyce v. Ford Motor Co.* (2011) 198 Cal.App.4th 1478, 1492 [" 'enrolled bill reports cannot reflect the intent of the Legislature because they are prepared by the executive branch, and then not until after the bill has passed the Legislature and has become "enrolled" ' "]; *McDowell v. Watson* (1997) 59 Cal.App.4th 1155, 1161-1162, fn. 3 ["it is not reasonable to infer that enrolled bill reports prepared by the executive branch for the Governor were ever read by the Legislature"].)

26

c. Section 2802.1

The only other legislative history on point we have discovered concerns Article 2. We have already discussed the fact that the Legislature added half a dozen provisions to Article 2 in which it expressly referred to public employers when it intended to do so, yet left section 2802 unchanged. We will briefly touch again on one of those provisions, section 2802.1.

Assembly Bill No. 2588, which created section 2802.1, was designed to alleviate a nursing shortage during the COVID-19 pandemic by prohibiting hospitals from requiring nursing applicants to pay for in-house training, i.e., training unrelated to the nurses' broader certification. Section 2802.1 states that the reimbursement obligation prescribed by section 2802 applies to the training policies of public hospitals. An analysis of the bill by the Senate Committee on Labor, Public Employment and Retirement stated the bill "only applies to applicants for employment and employees providing direct patient care for an employer, whether public or private." (Sen. Labor, Pub. Employment & Retirement Com., Analysis of Assem. Bill No. 2588 (2019-2020 Reg. Sess.) as amended Aug. 11, 2020, p. 2, italics added.) By confirming that the term "employer" refers to both public and private entities for purposes of the bill, the analysis suggests that "employer" standing alone in section 2802 would not refer to public entities.

4. Case Law

No case has applied the reimbursement obligations set forth in section 2802 to a public employer.

*Johnson v. Arvin-Edison Water Storage Dist.* (2009) 174 Cal.App.4th 729 held that the Legislature generally follows the rule that unless the law in question expressly states otherwise, a

27

Labor Code provision does not apply to public employers.  There, the court observed that "[i]n the context of reviewing the legislative history of an amendment to provide whistleblower protection to public employees (§ 1102.5), the court in *Campbell v. Regents of University of California* (2005) 35 Cal.4th 311 quoted the Senate Committee on Industrial Relations as follows: ' "These provisions are silent as to their applicability to public employees.  Generally, however, provisions of the Labor Code apply only to employees in the private sector unless they are specifically made applicable to public employees." ' " (*Id*. at p. 736.)  The *Johnson* court held that the Legislature's iteration of the rule "is an indication that the Legislature follows it." (*Ibid*.)

In the context of wage and hour requirements, for example, "appellate decisions have uniformly concluded that, unless the laws in question expressly state otherwise, the Labor Code's wage and hour requirements do not apply to public employers." (*Stone*, *supra*, 16 Cal.5th at p. 1059.)  One court held that payment to employees for work uniforms is a part of the employees' compensation and should be considered like any other payment of wages, compensation or benefits. (*In re Work Uniform Cases* (2005) 133 Cal.App.4th 328, 338.)  Under this determination, the court held, an employee's claim of entitlement to compensation for uniform expenses as indemnification under section 2802 directly conflicts "with a public entity's power to provide for compensation of its employees . . . ." (*Ibid*.)

In *Weil v. Raisin City Elementary School District* (E.D. Cal., Dec. 20, 2021, No. 1:21-cv-00500-AWI-EPG) 2021 WL 6010137, the district court held that the contrast between the statutory silence of section 2802 on the scope of the term "employer" and the express provisions in nearby statutes in Article 2 alone

28

sufficed to establish that section 2802 does not apply to public employers.  (*Id*. at p. *4.)

Krug relies on *Mendoza v. Fonseca McElroy Grinding Co., Inc.* (2021) 11 Cal.5th 1118 (*Mendoza*) for the proposition that legislative silence on whether the term "employee" applies to public as well as private employees suggests that public employees are included.  *Mendoza* is not instructive.

In *Mendoza*, private contractors sought prevailing wages for mobilization work, which involved transporting heavy machinery to and from a public works site.  In the course of the analysis, the Court discussed the origins of the prevailing wage laws, which were first enacted in an uncodified version in 1931 in response " 'to the dire economic conditions of the Great Depression, when private construction diminished severely and "the oversupply of labor was exploited by unscrupulous contractors to win government contracts." ' "  (*Mendoza, supra*, 11 Cal.5th at p. 1123.)

The prevailing wage law evolved through three versions.  The uncodified measure (the 1931 Act) provided in relevant part that a prevailing wage must be paid to " 'all laborers, workmen and mechanics employed by or on behalf of the State of California, or by or on behalf of any county, city and county, city, town, district or other political subdivision of the said state, engaged in the construction of public works. . . .  Laborers, workmen and mechanics employed by contractors or subcontractors in the execution of any contract or contracts for public works . . . shall be deemed to be employed upon public works.' "  (Stats. 1931, ch. 397, § 1, p. 910.)  [¶]  The first sentence quoted above extended coverage to those 'employed by or on behalf' of the government in constructing public works.  [Fn.]

29

The second sentence 'deemed to be employed upon public works' those who work for contractors or subcontractors. The latter sentence . . . appeared to clarify that prevailing wage protection extends not only to those employed directly by the government, as confirmed in the first sentence, but also to those who were employed by contractors or subcontractors." (*Mendoza*, *supra*, 11 Cal.5th at pp. 1127-1128.)

When the prevailing wage law was codified in 1937, the two sentences quoted above were split into two new sections, 1771 and 1772. (Stats. 1937, ch. 90, p. 243.) Section 1771 provided that a prevailing wage would be paid on public work "to all workmen employed on public works." (*Ibid*.) Section 1772 provided: "Workmen employed by contractors or subcontractors in the execution of any contract for public work are deemed to be employed upon public work." (*Ibid*.)

The Legislature explicitly excluded government workers from the prevailing wage entitlement nearly 40 years later. (*Mendoza*, *supra*, 11 Cal.5th at p. 1130.)

*Mendoza* held that even though the 1937 version of section 1771 was silent as to whether "all workmen" included public employees, it held "there is little reason to believe the omission reflected a legislative intent to exclude governmental workers from the scope of the prevailing wage law." (*Mendoza*, *supra*, 11 Cal.5th at p. 1130.) This is so, the Court reasoned, not only because section 1771 contained no exclusion for public employees, but because section 1772's express reference to private workers again appeared to clarify that prevailing wage protection extends not only to those employed directly by the government, as confirmed in the first sentence. Moreover, the Court reasoned, an "explicit exclusion of prevailing wage entitlement for government

workers was . . . adopted by the Legislature" nearly 40 years later, suggesting government workers were not excluded before then.  (*Ibid*.)  Finally, the Court observed that the Commission, which prepared the Proposed Labor Code in 1936 to codify various labor statutes, included "no comment or annotation associated with proposed section 1771 that would indicate an intent to change the meaning or scope of the provision in the 1931 Act from which that statute was derived."  (*Id*. at fn. 14.)

In *Mendoza*, therefore, the Court did not hold that legislative silence on whether the term "employee" applies to public as well as private employees suggests that public employees are included, it held that the evolution of section 1772 itself implied that the Legislature intended to protect public as well as private workers.

No similar evolution in section 2802 exists here.  On the contrary, section 2802 has proven impervious to changes in the Labor Code that apply employer obligations to public entities.

Krug relies on *In re Acknowledgment Cases* (2015) 239 Cal.App.4th 1498 for the proposition that section 2802 applies to public employers.  We disagree.  In that case the City of Los Angeles alleged that police academy trainees were liable for the cost of their training.  The issue was whether the costs of employee training qualified as "necessary expenditures or losses incurred by the employee" in direct consequence of the discharge of the employee's duties.  (§ 2802, subd. (a).)  Apparently, no party raised, and the court did not discuss whether section 2802 applies to public as opposed to only private employers.  Cases are not authority for propositions not considered.  (*B.B. v. County of Los Angeles* (2020) 10 Cal.5th 1, 11.)

31

Krug argues that some courts have held that "employers" includes public employers. (E.g., *Flowers v. Los Angeles County Metropolitan Transportation Authority* (2015) 243 Cal.App.4th 66, 79 [absent a specific exemption, a wage order covering "[e]very employer" was broad enough to subject public employers to a minimum wage requirement]; *Sheppard v. North Orange County Regional Occupational Program* (2010) 191 Cal.App.4th 289 [a wage order's general terms applied to a public employer in the absence of an exemption]; *Guerrero v. Superior Court* (2013) 213 Cal.App.4th 912; *Marquez, supra*, 32 Cal.App.5th 552 [same].) In other words, Krug argues, general terms like "employer" include public employers unless defined to exclude them.

These cases are distinguishable because as discussed in *Stone*, they involved provisions that are expressly applicable to public employers. *Sheppard*, for example, "considered whether the minimum wage provision in IWC wage order No. 4-2001 (Cal. Code Regs., tit. 8, § 11040) applied to a public employer. . . . [T]he *Sheppard* wage order . . . appl[ied] to all employers, including public entities." (*Stone, supra*, 16 Cal.5th at p. 1060.) The same wage order was at issue in *Marquez*. (*Marquez, supra*, 32 Cal.App.5th at p. 569.) Similarly, *Flowers* considered a public transit authority's liability for minimum wage and rest break violations under IWC wage order No. 9-2001 (Cal. Code Regs., tit. 8, § 11080), which expressly made minimum wage and rest period requirements applicable to public transit drivers. (*Stone*, at p. 1060.) Finally, *Guerrero* discussed public entity liability when construing IWC wage order No. 15-2001 (Cal. Code Regs., tit. 8, § 11150), which defines "employer" as "any person as defined in Section 18 of the Labor Code," defined "employee" as "any person employed by an employer" (Cal. Code Regs., tit. 8, § 11150, subd. (2)), and " 'unlike 14 of the 17 industry, occupation and

32

miscellaneous wage orders . . . does not expressly exempt public employees from its provisions.' [Citation.] Accordingly, based on its plain language, the wage order's requirements applied to public as well as private employers" (*Stone*, at p. 1060, italics omitted).

Krug relies on *Knowles v. Roberts-at-the-Beach Co.* (1953) 115 Cal.App.2d 196 for the idea that an unrestricted interpretation of "employer" applies under another Article 2 statute, section 2750, which states, "The contract of employment is a contract by which one, who is called the employer, engages another, who is called the employee, to do something for the benefit of the employer or a third person." We disagree. *Knowles* involved a personal injury suit by a bar patron hurt while participating in a floor show. The issue on appeal was whether the patron could void the bar's assumption-of-the-risk affirmative defense on the theory she was an unpaid "employee" during the floorshow. (*Knowles*, at pp. 198-199.) Nothing in *Knowles* suggests that the meaning of "employer" in section 2802, and whether it includes public entities, can be determined by reference to section 2750, especially in light of *Stone*'s observation that "[t]he Labor Code does not [generally] define the term 'employer.'" (*Stone, supra*, 16 Cal.5th at p. 1054.) In any event, we fail to see how the phrase "one[] who . . . engages another . . . to do something" materially explains the term "employer" for our purposes here. (§ 2750.)[6]

---

[6] Although no party contends any wage order directly applies here, CSU argues that the amendment history of Wage Order No. 4-2001, governing "professional, technical, clerical, mechanical, and similar occupations" (Cal. Code Regs., tit. 8, § 11040(1)), reflects the legislative intent behind Labor Code section 2802. This is so, CSU argues, because section 9(B) of the

5. Conclusion

In sum, although the language of section 2802 is silent on whether "employer" denotes both public and private entities, the statutory structure and legislative history provide positive indicia of legislative intent to exclude public employers from the provision's reimbursement obligations. The Legislature: (1) declined to expressly apply section 2802 to public employers, as it did in the workers' compensation laws, which were enacted in the same 1937 legislative session; (2) declined to expressly apply the reimbursement obligation of section 2802 to public employers, as

---

wage order, which obligates an employer to "provide and maintain" required "tools or equipment," is analogous to Labor Code section 2802, and was left untouched in 2000 when other provisions of the wage order were amended to expressly apply to public employers. CSU argues this wage order history reflects a legislative intent not to apply statutory reimbursement obligations to public employers.

Krug, on the other hand, relies on *Bowerman v. Field Asset Services, Inc.* (9th Cir. 2022) 39 F.4th 652, 665, for the proposition that the wage orders do not govern section 2802 reimbursement obligations. We need not decide this issue because no party contends that a wage order directly applies here. However, inapplicability of a wage order only means that section 2802 does not tie the definition of "employer" to section 18's definition of "person"; it does not mean that section 2802 applies to public employers.

While we agree that the history of some of the wage orders shows certain provisions do not apply to public employers, we respectfully reject both Krug's and CSU's broad reliance on wage orders and DLSE communications as evidence of the legislative intent behind section 2802.

34

it did with other employer obligations set forth in sections 555, 552, 233, and 1182.12; (3) declined to amend section 2802 to apply to public employers when it added or amended other provisions in Article 2 to do so expressly; and (4) expressly made section 2802 applicable to public employers only in the limited context of reimbursement for employer-required training in public hospitals. Moreover, the Commission, which compiled the predecessor to section 2802, relied on a treatise which defined "employer" in terms of private entities and limited its discussion to private principal/agent relationships.

Therefore, we conclude section 2802 does not obligate CSU to reimburse employees for work-related expenses, without the need to resort to interpretive maxims.[7]

---

[7] Krug observes that Education Code section 89500 directs CSU to "provide by rule for the government of [its] appointees and employees, pursuant to this chapter and other applicable provisions of law, including, but not limited to: . . . uniform and equipment allowances . . . ." (Ed. Code, § 89500, subd. (a)(1).) He argues that because CSU must provide uniform and equipment allowances pursuant to "other applicable provisions of law," its doing so is subject to legislative regulation. (*Slivkoff v. Board of Trustees* (1977) 69 Cal.App.3d 394, 403 [CSU is subject to legislative regulation].) We do not disagree. We hold only that section 2802, specifically, provides no such regulation.

## DISPOSITION

The judgment is affirmed.  Each side is to bear its own costs on appeal.

CERTIFIED FOR PUBLICATION


                                        M. KIM, J.


We concur:



BENDIX, Acting P. J.



WEINGART, J.

36